IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
BATESVILLE DIVISION

**TROY J. DAIGLE**                                                                                          **PLAINTIFF**

v.                                    **CASE NO. 1:10CV00011 BSM**

**THE HARTFORD LIFE AND**
**ACCIDENT INSURANCE COMPANY**                                          **DEFENDANT**

### ORDER

Plaintiff Troy J. Daigle moves for an order reinstating his long-term disability benefits, or, in the alternative, for an order remanding his appeal to the plan administrator for further review. [Doc. No. 24]. Defendant Hartford Life and Accident Insurance Company ("Hartford") has filed a brief in opposition to Daigle's motion and cross-moves for judgment on the ERISA administrative record. [Doc. No. 28]. For the reasons set forth below, Daigle's motion is denied and Hartford's cross-motion is granted.

### I. LEGAL STANDARD

Section 502(a)(1)(B) of the Employee Retirement Income Security Act of 1974 (ERISA) grants a participant or beneficiary the right to seek judicial review of a termination of long-term disability benefits. 29 U.S.C. § 1132(a)(1)(B); *Woo v. Deluxe Corp.*, 144 F.3d 1157, 1160 (8th Cir. 1998). Where a benefits plan gives the administrator "discretionary authority to determine eligibility for benefits," the administrator's decision is reviewed for an abuse of discretion. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). Here, Daigle concedes that his policy provides Hartford with discretionary authority to determine eligibility for benefits.

Under the abuse-of-discretion standard, the administrator's decision will be upheld if it is reasonable, that is, if it is supported by substantial evidence. *King v. Hartford Life & Accident Life Ins. Co.*, 414 F.3d 994, 999 (8th Cir. 2005). Substantial evidence is less than a preponderance of the evidence, but "more than a scintilla." *House v. Paul Revere Life Ins. Co.*, 241 F.3d 1045, 1048 (8th Cir. 2001). The inquiry is not whether a reasonable person *would have* reached the same decision as the plan administrator, but rather, given the evidence in the record, whether a reasonable person *could have* reached a similar decision. *Ferrari v. Teacher's Ins. & Annuity Ass'n*, 278 F.3d 801, 807 (8th Cir. 2002).

In *Metropolitan Life Insurance Co. v. Glenn*, the Supreme Court addressed the standard of review in ERISA cases and held that the conflict of interest created when an insurer is both the plan administrator and payer of plan benefits may be considered as one factor in determining whether the plan administrator abused its discretion in denying benefits. 554 U.S. 105, 116-17 (2008). To trigger heightened scrutiny, however, there must be "a palpable conflict of interest or a serious procedural irregularity" that caused a "serious breach of the plan administrator's fiduciary duty." *Parkman v. Prudential Ins. Co. of Am.*, 439 F.3d 767, 772 n.5 (8th Cir. 2006).

## II. BACKGROUND

Daigle originally brought this action in the Circuit Court of Izard County, Arkansas. Hartford timely filed a notice of removal. The ERISA scheduling order provided that the parties were to file a stipulated administrative record and then commence briefing according

to the schedule set forth in the order. The administrative record submitted by the parties consists of five discs of data with an index of redacted items, and the issues have been fully briefed.

A.   Facts

Daigle was employed full-time as a truck driver for Wal-Mart Stores, Inc. from 1990 until he became disabled due to back pain in May 1997. Specifically, Daigle asserted that a previous injury was aggravated when his truck "hit a bad hole in the road." In August 1997, he began receiving long-term disability benefits under a policy issued and administered by Hartford. Daigle received treatment in late 1997 and was able to go back to work briefly in the first half of 1998 until he again felt unable to work due to back pain. Hartford resumed paying Daigle benefits.

Hartford reviewed Daigle's medical records in March 1999 and realized the records lacked anything objectively showing that he suffered the limitations he was claiming. At Hartford's request, Daigle underwent a functional capacity evaluation that showed he could work "at the medium level, although not for a full eight-hour day." Hartford therefore concluded that Daigle could return to work and terminated his benefits. Daigle appealed, and his benefits were reinstated because Hartford found that although he had the capacity to perform a "sedentary or light type of occupation" he could not perform his "own occupation" of truck driver.

In July 2000, Daigle told Hartford he was interested in retraining for a light or

sedentary occupation under its rehabilitative employment program. Concentra, the company hired by Hartford to assist Daigle with retraining, offered to help Daigle obtain his GED so that he could enroll in a retraining service. Daigle's file with Concentra was closed in late 2000 when he had not made any progress toward beginning a GED program. Because Daigle ceased engaging in the rehabilitative employment program, the insurance policy's standard for determining when he was totally disabled changed. While enrolled in the rehabilitative employment program, the standard was whether he was unable to perform the essential duties of *his own* occupation. When he ceased engaging in the rehabilitative employment program, the standard became, whether he was unable to perform the essential duties of *any* occupation. When the standard changed, Hartford sought to determine whether Daigle remained eligible for benefits under that new definition of total disability.

In early 2002, Daigle completed a questionnaire in which he stated that he was experiencing back pain, spasms, and leg pain and that he could not ride in a car or stand for more than a short period of time. He indicated that he had to lie down often, had to use a cane when the pain was more severe, and that he spent most of his time taking care of his four children and doing light work around the house. His physician, Dr. Myers, contemporaneously completed a statement of continuing disability and provided a primary diagnosis of back pain and a secondary diagnosis of osteoarthritis. Dr. Myers's report indicated that Daigle had checkups every two months and took prescription medications. It further stated that Daigle could stand and walk only occasionally and that these limitations

4

were likely to last indefinitely.

After reviewing Daigle's completed questionnaire, Dr. Myers's report, and Daigle's updated medical records, Hartford concluded that there was no support for Daigle's claimed limitations and referred his file to its special investigation unit. The private investigators hired by Hartford were told to observe Daigle and confirm whether his stated limitations of back pain and spasms, inability to ride in a car for more than short periods of time, occasional cane usage, and inability to sit or stand for more than short periods of time were visibly apparent. The investigators videotaped several persons for several days but were unable to verify whether any of those persons was Daigle.

Hartford continued paying Daigle benefits from January to May 2003 while it waited for Daigle to return another questionnaire. Daigle returned the questionnaire in June 2003. Around this same time, Daigle relocated from Brookhaven, Mississippi to Mt. Pleasant, Arkansas. His questionnaire indicated that his back remained in considerable pain and that he relied on medication and a cane. The accompanying statement of continued disability was completed by Dr. Gray and provided a primary diagnosis of degenerative disc disease and a secondary diagnosis of cervical stenosis. Dr. Gray's report recommended that Daigle should neither sit nor drive, nor stand nor walk for extended periods.

Upon receipt of these documents, Hartford requested Daigle's medical records from his new doctors in Arkansas. Among the documents provided were records from Dr. Ismail, which showed that although Daigle complained of back and neck pain and was taking

several pain medications, he was in "no distress" and had normal musculoskeletal and neurological examinations. In June 2003, Dr. Ismail diagnosed Daigle with chronic pain syndrome and degenerative disc disease. Daigle declined Dr. Ismail's suggestions that he receive an epidural steroid injection. In July 2003, Daigle told Hartford that he would likely be undergoing back surgery soon. Thereafter, Hartford decided to review Daigle's eligibility for continued benefits on an annual basis by requesting Daigle to complete annual questionnaires and reviewing his medical records.

In January 2005, Daigle' questionnaires indicated that he continued to suffer from chronic back pain and that on occasion he had to use a walker or cane and receive assistance putting on his shirt. Daigle also informed Hartford that he helped his wife with maintenance on her chicken farm when he was able and had fished a few times and did some woodworking. In refusing to sign Hartford's release form, Daigle stated that "I do not authorize the Hartford or anyone else to do any credit checks or any investigations whatsoever on me. You have all the medical records and doctors reports you need. Any kind of medical information you need can be gotten by contacting me, and only by contacting me." Dr. Gray's annual report indicated a primary diagnosis of degenerative disc disease and secondary diagnoses of cervical stenosis, carpal tunnel syndrome, and lumbar neuropathy. It also noted that Daigle had recently undergone carpal tunnel surgery.

In January 2006, Daigle's completed questionnaire indicated that he required assistance to get of bed, put on his shoes, bathe, dress, use the toilet, and transfer from bed

to chair. Daigle's questionnaire further indicated that he had arthritis "from [his] neck to [his] tailbone." As with the year before, Daigle refused to sign Hartford's release form, noting that any further investigations would be "illegal" and that if Hartford obtained any information from a source other than him he would "subject [it] to a legal battle." Dr. Gray's partner, Dr. Darwin, nonetheless completed a statement of continued disability that provided a primary diagnosis of degenerative disc disease and secondary diagnoses of cervical stenosis, carpal tunnel syndrome, and lumbar neuropathy. The report also noted that Daigle's treatment included exercise, pain medications, and a TENS unit. It concluded with Dr. Darwin's opinion that Daigle's limitations on standing, walking, and driving were indefinite.

In February 2006, Daigle's claim was referred back to Hartford's special investigation unit which hired a private investigator to conduct surveillance of Daigle for two consecutive days in February and two more in March. In February, the private investigator did not observe Daigle on the first day. On the second day, however, the investigator saw Daigle leave his house for approximately six hours during which he visited another residence and then what appeared to be his wife's chicken farm. The investigator stated that Daigle walked without a cane or other assistive device and bent over to take off his shoes on one occasion.

On the first day of surveillance in March, the investigator observed Daigle at a pharmacy, a school gym, a grocery story, walking one quarter of a mile uphill, riding as a passenger for over two hours to a sporting event in Little Rock, standing outside the arena

for at least forty minutes, walking up and down stairs, clapping his hands, raising his arms, involving himself in the excitement of the game, and driving another two hours back to his residence in Mt. Pleasant. All of these activities were done without the assistance of a cane. During the trip to the grocery store, the investigator stated that Daigle bent over to enter a car, pushed a shopping cart with groceries in it, and unloaded groceries into the rear of a car. The private investigator did not observe Daigle leave his residence on the second day.

In June 2006, one of Hartford's investigators met with Daigle to discuss his general functionality and discrepancies developed in the investigation. The investigator reported that both the exterior and interior of Daigle's home were neat and clean. During the interview, the investigator observed that Daigle's daughters climbed all over Daigle and sat on his lap. The investigator did not observe a cane or walker and noted that Daigle walked with a smooth stride, stable gait, and no objective signs of difficulty or pain. At one point during the interview, the investigator saw Daigle stand up from his seat on a couch using both his left and right hands to push himself up and began walking.

Daigle told the investigator that he could not work because of chronic pain in his spine from his neck to his tailbone, arthritis, degenerative disc disease, cervical spinal stenosis, neuropathy of the legs and left elbow, and carpal tunnel in both hands and wrists. As to his physical capabilities, Daigle reported being able to stand for thirty minutes at a time, bench press 110 pounds on his weight machine, and carry a 5-gallon bucket of dead chickens. Additionally, Daigle told the investigator that he could sit for one hour, drive for

one hour, squat, kneel, and push a shopping cart and a lawn mower. Daigle stated that could not bend, twist, reach overhead, use stairs, or get out of bend or walk long distances without a cane. In describing a typical day to the investigator, Daigle said that he did housework and that, if he was feeling well enough, he worked on a friend's 400-acre cattle ranch. While at the ranch, Daigle said he worked cattle, fixed equipment, drove a four-wheeler and a tractor, repaired fences, and did other "odd jobs." Although Daigle's son told the investigator that Daigle worked at the cattle ranch from nine o'clock to five o'clock and sometimes later, Daigle said he only spent four or five hours per day at the ranch. Daigle said that, in lieu of a salary, he was paid in beef for his work on the ranch.

Daigle and the investigator also discussed his wife's chicken farm. Daigle indicated that the farm was titled solely in her name because "she didn't pay into Social Security sufficiently to get benefits," and that while they owned the farm he was there "24 hours a day, 7 days a week" doing equipment maintenance and "whatever needed to get done."

As to his general health, Daigle told the investigator that he was under the care of Dr. Darwin, his family doctor, that he took Cymbalta, Methadone, and Carisoprodol, and that he weighed approximately 375 pounds. At the end of the three hour interview, Daigle refused to sign a statement prepared by the investigator.

In August 2006, Hartford reviewed medical records provided by Dr. Gray's and Dr. Darwin's medical clinic and found that the objective findings did not seem to support the severity of Daigle's complaints of pain. Hartford requested that Dr. Darwin and Dr.

Grammer, a specialist to whom Dr. Darwin referred Daigle to for his knee pain, respond to certain inquiries as to Daigle's level of functionality. After neither Dr. Darwin nor Dr. Grammer responded to this request, Hartford contacted Medical Advisory Group, LLC to conduct an independent medical-records review.

Medical Advisory Group assigned Dr. Phelps, a Fellow of the American Academy of Orthopedic Surgeons and Diplomate of the American Board of Orthopedic Surgery, to conduct the review of Daigle's medical records. Though he was not able to interview Dr. Grammar, Dr. Phelps interviewed Dr. Darwin. Dr. Darwin reported that she had not reviewed the surveillance videos and declined to assess Daigle's functionality in the workplace, suggesting that a functional capacity evaluation would be more appropriate. Dr. Darwin further indicated that his case consisted primarily of subjective complaints and that the only objective finding in terms of his back was tenderness of the spinous processes. In addition to Daigle's medical records, Dr. Phelps also reviewed the private investigator's surveillance videos and notes from the interview.

Dr. Phelps's December 2006 report to Hartford concluded that Daigle was not restricted from working full time. Accordingly, on January 4, 2007, Hartford prepared an employability analysis report taking into account Daigle's functional capabilities, education, training, and work history. The job-matching system used by Hartford indicated that Daigle had the residual capacity to perform the occupation of truck safety inspector. Hartford found that this occupation was prevalent in the national economy and that it exceeded the policy's

earnings requirement.

On January 31, 2007, Hartford wrote to Daigle to inform him that it was terminating benefits as of that date because he was no longer disabled under the terms of the policy. Hartford's letter explained to Daigle that he the right to appeal its decision and provided him with a brief explanation of how to do so.

Daigle appealed and provided Hartford with a handwritten authorization to update his medical records. The new medical records showed that Daigle visited an emergency room in March 2007 for back pain related to throwing trash in a dumpster and twisting his back. The physician noted that Daigle was in moderate pain and left the hospital ambulating without assistance. A May 2007 MRI showed "normal appearing vertebral body heights," "a mild endplate edema seen along the inferior aspect of L5 associated with an L5-S1 anterior spur," "disk desiccation . . . at the L3-L4 and T11-12 level," "a small posterior osteophyte at the T11-12 level, which mildly effaces the CSF anterior to the spinal cord without evidence of spinal cord compression," "no significant clumping of nerve roots," "subligamentous disk bulges, [causing] effacement of the CSF anterior to the spinal cord," and "no significant nerve root compression and only mild neural foramina narrowing." After this MRI, Daigle was given a temporary spinal cord stimulator for pain management.

After receiving these updated records, Hartford sent Daigle's file to Reliable Review Services for a second independent medical-records review. Reliable Review Services assigned Dr. Waltrip, who is board-certified in orthopedic surgery, and Dr. Goldman, who

is board-certified in psychiatry and addiction psychiatry, to conduct the review. Dr. Waltrip's and Dr. Goldman's July 2007 report concluded that Daigle was capable of at least sedentary to light duty work. Their conclusion remained unchanged after reviewing supplemental medical records provided by Daigle. In September 2007, Hartford wrote to Daigle to inform him that it had affirmed its decision to terminate his benefits because it found that Daigle was "capable of unrestricted sedentary and light work" and that he was "vocationally employable in the light work category." Hartford further stated that this was its final determination on Daigle's claim and appeal.

B.   Relief sought

On January 15, 2010, Daigle filed suit in state court pursuing remedies under state law. Hartford removed that action to the undersigned on February 17, 2010, stating that because Daigle's claim is governed by ERISA, which completely preempts state law, is therefore an action arising under federal law.

On July 12, 2010, Daigle filed his motion seeking the reinstatement of his benefits retroactive to January 31, 2007, or alternatively, for an order remanding his case back to Hartford for further consideration. Hartford's August 13, 2010, response in opposition also stated a cross motion seeking a judgment on the administrative record.

C.   Basis for Hartford's decision

Hartford's January 31, 2007, letter to Daigle states that its decision to terminate his benefits was based on its determination that he no longer met the definition of disability

under the plan definition. Although Hartford noted that all of the papers in Daigle's file were viewed as a whole, it specifically identified the following parts of Daigle's file as the bases for that determination: (1) Daigle's long-term disability application signed and dated June 18, 1997; (2) an attending physician's statement of disability completed by Dr. Darwin dated January 27, 2006; (3) Daigle's claimant questionnaire completed on January 20, 2006; (4) video surveillance of Daigle's activities on February 23, 2006, and March 25, 2006; (5) the interview conducted in Daigle's home by Hartford Investigator, Howard W. Spencer, on June 27, 2006; (6) Daigle's file reviewed by the medical clinical case manager on October 10, 2006; (7) a faxed response from Dr. Darwin dated October 19, 2006; (8) Medical Advisory Group's (MAG) review dated November 25, 2006; (9) an additional response from MAG review dated December 20, 2006; and (10) an employability analysis report completed by Hartford's rehabilitation staff dated January 4, 2007.

### III. DISCUSSION

As noted above, in ERISA cases, a district court's role is not to second guess the determination of the plan administrator. Instead, all that is required is to verify that there was substantial evidence for its determination, i.e., that a reasonable person could have reached the same conclusion. Here, the administrative record certainly provided such evidence.

Throughout the period during which Daigle received benefits, there were numerous instances when doctors were unable to pair objective findings with Daigle's subjective

complaints. This lack of objective evidence essentially required Hartford to take Daigle at his word that he was physically unable to work. Accordingly, Hartford sought to verify these limitations through visual surveillance. Plainly put, the photos, videos, and the investigator's account support a reasonable belief that Daigle is not, in fact, disabled under the plan's definition. Additionally, the independent medical evaluations tend to corroborate that there was no physical or psychiatric reason why Daigle could not perform light or sedentary work. Given this finding, Hartford analyzed Daigle's functional capabilities, education, training, and work history and found that he could perform a light to sedentary occupation that existed locally and nationally. Therefore, Daigle's position that Hartford failed to conduct a full and fair review is unfounded.

     Daigle's other arguments are similarly unpersuasive. First, absent specific language in the policy, nothing requires a plan administrator to conduct a functional capacity evaluation prior to making a benefits determination. Second, the standard for granting social security benefits is not necessarily applicable to long-term disability plans, and the terms of Daigle's policy did not require Hartford to consider the Social Security Administration's decision. Third, the record does not contain evidence of the specific side effects of Daigle's pain medication; therefore, Hartford's employability analysis was not arbitrary for failing to explicitly consider possible side effects. Finally, Daigle's suggestion that Hartford's decision was based on only a limited portion of the administrative record is simply speculative. Indeed, as set forth above, there was clearly substantial evidence in the record

to support the plan administrator's determination.

## IV. CONCLUSION

For these reasons, Daigle's motion [Doc. No. 24] to reinstate benefits or remand to the plan administrator is denied, and Hartford's cross-motion for judgment on the administrative record is granted.

IT IS SO ORDERED this 11th day of March, 2011.

                                                            UNITED STATES DISTRICT JUDGE